1

2

3

4

5

6

7

8             UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RODNEY JEROME WOMACK,                    No.  2:15-cv-0533 MCE KJN P

12             Plaintiff,

13        v.                                  ORDER AND FINDINGS &
                                              RECOMMENDATIONS
14    J. WINDSOR, et al. ,

15             Defendants.

16

17   I.  Introduction

18        Plaintiff is a state prisoner, proceeding pro se and in forma pauperis, in this civil rights

19   action filed pursuant to 42 U.S.C. § 1983.  Plaintiff contends that defendants Dr. Windsor, Dr.

20   Lankford, Dr. Lee and T. Mahoney were deliberately indifferent to his medical needs while he

21   was incarcerated at High Desert State Prison ("HDSP"), in violation of the Eighth Amendment, in

22   connection with plaintiff's pain management and need for further ankle surgery.  Specifically,

23   plaintiff contends that defendants' decision to change his pain medication was made for non-

24   medical reasons, based on a policy at HDSP that no inmate would be prescribed methadone or

25   morphine, and their failure to provide him with adequate pain medication or to timely provide the

26   second surgery subjected him to excruciating pain.  Pending before the court is defendants'

27   motion for summary judgment.  As discussed below, the undersigned recommends that the

28   motion be granted.

1

II. <u>Background</u>

Plaintiff initiated this action on March 9, 2015.  On May 6, 2015, the court screened the complaint, and deemed service appropriate on defendants Dr. Windsor, Dr. Lankford, Dr. Lee and T. Mahoney.  (ECF No. 9.)  On August 24, 2015, defendants filed a motion to dismiss.  (ECF No. 19.)  On March 30, 2016, plaintiff's claim that defendant Mahoney denied plaintiff surgery was dismissed, but in all other respects, the motion to dismiss was denied.  (ECF No. 26.)

A revised scheduling order issued on September 7, 2016.  (ECF No. 43.)  Defendants' motion for summary judgment was filed on December 15, 2016, and re-noticed on July 12, 2017.  (ECF No. 60, 76.)  Plaintiff filed an opposition on July 28, 2017.  (ECF Nos. 77, 78.)  On August 2, 2017, defendants provided the declaration of Lopez which was inadvertently omitted from their motion.  (ECF No. 79.)  On August 3, 2017, defendants filed a reply.  (ECF No. 80.)

On August 14, 2017, plaintiff filed a response to defendants' reply, otherwise known as a sur-reply.  (ECF No. 81.)  On August 17, 2017, defendants filed a motion to strike plaintiff's unauthorized sur-reply.  (ECF No. 83.)

III. <u>Motion to Strike</u>

The Local Rules do not authorize the routine filing of a sur-reply.  Nevertheless, a district court may allow a sur-reply "where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief."  <u>Hill v. England</u>, 2005 WL 3031136, at *1 (E.D. Cal. 2005); <u>accord</u> <u>Norwood v. Byers</u>, 2013 WL 3330643, at *3 (E.D. Cal. 2013) (granting the motion to strike the sur-reply because "defendants did not raise new arguments in their reply that necessitated additional argument from plaintiff, plaintiff did not seek leave to file a sur-reply before actually filing it, and the arguments in the sur-reply do not alter the analysis below"), <u>adopted</u>, 2013 WL 5156572 (E.D. Cal. 2013).  In the present case, defendants did raise new arguments in their reply, contending that plaintiff's opposition was a "sham" affidavit.  Good cause appearing, defendants' motion to strike plaintiff's sur-reply is denied, and the undersigned has considered plaintiff's sur-reply in ruling on the pending motion for summary judgment.

////

////

IV.  Plaintiff's Complaint

Plaintiff alleges that in May of 2009, while he was housed at New Folsom State Prison ("New Folsom"), orthopedic surgeon Eric Giza determined that plaintiff's chronically-damaged left ankle needed a second surgery, "denovo cartilage implantation," otherwise plaintiff would be in constant pain, and that limping on the ankle would cause further damage.  (ECF No. 1 at 1.) New Folsom medical staff opted to put plaintiff on a pain management medication of methadone, which plaintiff claims is one of only two drugs that would relieve the unbearable, excruciating pain plaintiff suffered twenty-four hours a day, every day.  Plaintiff agreed to this pain management protocol because he "was not enthusiastic about the denovo cartilage implantation procedure," which he describes as "brutal."  (ECF No. 1 at 2.)

However, on March 18, 2014, plaintiff was transferred to HDSP, where Dr. J. Windsor explained that HDSP medical staff has a policy that no inmate, regardless of their pain situation, will be prescribed methadone or morphine.  In response, plaintiff immediately sought to schedule the denovo cartilage implantation procedure, but he alleges that Dr. Windsor failed to schedule such surgery, and also failed to provide plaintiff adequate pain medication.  (ECF No. 1 at 4-5.) On March 2, 2015, Dr. Lankford told plaintiff that he would not schedule the second surgery for plaintiff because of plaintiff's high blood pressure, and plaintiff contends that Dr. Lankford refused to provide him with adequate pain medication.  Finally, plaintiff alleges that Dr. Lee and CEO T. Mahoney personally became aware of plaintiff's need for the second surgery and adequate pain medication during the administrative appeals process, specifically 602 appeal Log Nos.: HDSP HC 14028252 and HDSP HC 14028473, yet both failed to take steps to ensure that plaintiff either received the second surgery or adequate pain medication.[1]  (ECF No. 1 at 5.) Plaintiff states that he has been requesting his surgery at HDSP for the past twelve months, to no avail, and that he continues to "suffer unbearable, excruciating pain every single day."  (ECF No. 1 at 6.)

---

[1]  As noted above, plaintiff's claim that Mahoney failed to provide the surgery was dismissed.

V.  <u>Undisputed Facts</u>[2] ("UDF")

    1.  Plaintiff Rodney Jerome Womack is an inmate in the custody of the CDCR, and at all times relevant to this action, plaintiff was housed at HDSP.

    2.  At all relevant times, defendants were employed at HDSP.

    3.  Plaintiff contends each of the defendants were deliberately indifferent to treating his left-ankle injury via adequate pain medication, and all defendants except Mahoney were deliberately indifferent to plaintiff's need for surgery.

    4.  As line physicians, defendants Windsor and Lankford regularly provided comprehensive health care and reviewed inmate treatments.  (Windsor Decl. ¶ 4.)

    5.  As the chief physician and surgeon, defendant Lee had access to plaintiff's Unified Health Record ("UHR") to determine whether he was receiving adequate treatment for his left ankle injury.  (Lopez Decl. ¶ 8.)

    6.  As a Chief Executive Officer (CEO), defendant Mahoney managed medical operations, reviewed dental and medical health services, and acted as the hiring authority for each of the medical divisions at the prison.  (Mahoney Decl. ¶ 3.)

    7.  As a CEO, defendant Mahoney had treating physicians, supervisors, and committee members reporting medical findings regarding an inmate's treatment.  (Mahoney Decl. ¶ 4.)

    8.  Plaintiff was transferred to HDSP in March of 2014, where he received reception treatment from defendant Dr. Windsor.  (ECF No. 1 at 4.)

    9.  On March 24, 2014, defendant Dr. Windsor noted plaintiff's high blood pressure, 146/100, and requested a follow up with a primary care physician if the blood pressure remained significantly elevated.  (Windsor Decl. ¶ 7; ECF No. 60-4 at 57.)

    10.  On March 24, 2014, defendant Dr. Windsor noted that plaintiff had fairly good left-ankle function, which in the doctor's opinion required pain medication consistent with management protocol.[3]  (Windsor Decl. ¶ 7.)  Dr. Windsor charted that plaintiff refuses Tylenol

---

[2]  For purposes of summary judgment, the undersigned finds these facts are undisputed, unless otherwise indicated.

[3]  Plaintiff disputes this fact, and declares that the pain management protocol at HDSP included a

4

1    #3.  (ECF No. 60-4 at 57.)

2         11.  Management protocol requires a treating physician to proceed incrementally through

3    medications with heightened dosages as indicated.  (Windsor Decl. ¶ 7.)

4         12.  On June 2, 2014, defendant Dr. Windsor treated plaintiff for hypertension; a diagnosis

5    with which plaintiff expressed skepticism.  (Windsor Decl. ¶ 8.)  His blood pressure was recorded

6    as 172/104.  (ECF No. 60-4 at 54.)

7         13.  At the June 2, 2014 appointment, plaintiff did not express any complaints regarding

8    his left ankle and Dr. Windsor did not diagnose any injury.  (Windsor Decl. ¶ 8.)  Plaintiff

9    disputes this fact; declaring that he complained of his left ankle pain and surgery needs every time

10   he encountered Dr. Windsor.  (ECF No. 77 at 2.)

11        14.  On July 9, 2014, plaintiff was treated for hypertension and left-ankle complaints.

12   (Windsor Decl. ¶ 9; ECF No. 60-4 at 53.)  His blood pressure was recorded as 149/95.  (ECF No.

13   60-4 at 53.)

14        15.  In July of 2014, plaintiff's ankle pain was being treated with Motrin despite his

15   requests for methadone.  (Windsor Decl. ¶ 9.)

16        16.  In July of 2014, defendant Dr. Windsor believed the proper course of treatment was

17   low-risk pain management and physical therapy.  (Windsor Decl. ¶ 9.)

18        17.  In July of 2014, defendant Dr. Windsor recommended plaintiff manage his weight in

19   an effort to increase ankle function.  (Windsor Decl. ¶ 9.)

20        18.  Defendant Dr. Windsor further recommended plaintiff continue with his prescription

21   for Nortriptyline.  (Windsor Decl. ¶ 9.)

22        19.  By the time defendant Dr. Lee reviewed plaintiff's care in July 2014, plaintiff had

23   received medications according to protocol, orthopedic consultations, and advice for how to

24

_____

25   policy prohibiting inmates from receiving specific medications regardless of the inmate's pain.
     (ECF No. 77 at 2.)  However, plaintiff adduced no competent evidence that such a policy exists.
26   Rather, the record demonstrates that in order for an inmate to receive methadone or morphine, the
     physician must determine that such medication is appropriate for the inmate.  Indeed, the record
27   reflects that at HDSP, plaintiff was prescribed morphine following his September 2015 left ankle
     surgery.  (ECF No. 78 at 94-95.)
28

minimize pain moving forward.[4]  (Lopez Decl. ¶ 12.)

20.  On August 14, 2014, defendant Dr. Windsor had an appointment scheduled with plaintiff which plaintiff refused to attend.  (Windsor Decl. ¶ 10; ECF No. 60-4 at 52.)

21.  By August of 2014, plaintiff was refusing to take his Nortriptyline prescription.  (Id.)

22.  On August 25, 2014, defendant Dr. Windsor referred plaintiff to an orthopedic evaluation to supplement her treatment.  (ECF No. 60-4 at 52; 61.)

23.  By September of 2014, defendant Dr. Windsor treated plaintiff for complaints of left-ankle pain and increased pain medication.  (Windsor Decl. ¶ 11.)

24.  In September 2014, plaintiff was still refusing pain medication.  (Windsor Decl. ¶ 11.)

25.  Defendant Dr. Windsor recommended weight management and awaited review of the records from plaintiff's orthopedic consultations.  (Windsor Decl. ¶ 11.)

26.  By September 2014, defendant Dr. Windsor's treatment plan for plaintiff included pursuing an additional surgery. (Windsor Decl. ¶ 7e.)  Dr. Windsor wrote, "Plan is for surgery again."  (ECF No. 60-4 at 50.)

27.  On September 25, 2014, defendant Mahoney prepared a Second Level response to Log No. HDSP-HC-14028252, which required review of plaintiff's medical treatment for his left ankle.   (Mahoney Decl. ¶ 8.)

28.  Defendant Mahoney consulted with Dr. Windsor, who reported that in her medical opinion, plaintiff was receiving adequate pain medication, and Dr. Windsor was waiting for the medical records in order to review the findings from U.C. Davis' Orthopedics Department. (Mahoney Decl. ¶ 8.)

29.  Defendant Mahoney also reviewed Pain Management Committee ("PMC") notes from September 25, 2013, which revealed that plaintiff had a history of selling methadone.[5]

---

[4]  Plaintiff disputes this fact, again claiming that HDSP policy prohibited inmates from receiving specific medications regardless of the inmate's pain.  (ECF No. 77 at 3.)  However, as set forth in footnote 3, and discussed below, plaintiff provided no competent evidence that such a policy existed at HDSP.

[5]  Defendants did not provide the PMC notes.  (ECF Nos. 60-4; 60-6.)  However, while plaintiff was housed at CSP-SAC, Dr. Hamkar wrote a chart note on September 26, 2013, in response to

6

(Mahoney Decl. ¶ 9.) Plaintiff declares that he never sold any methadone, and contends that this "fact" is "pure fabrication, manufacturing, on the part of medical staff." (ECF No. 77 at 3.)

30. Given plaintiff's history and current pain levels, defendant Mahoney determined it was improper to adjust plaintiff's treatment or prescribe him methadone. (Mahoney Decl. ¶ 9.)

31. On September 30, 2014, defendant Dr. Windsor treated plaintiff for pain complaints in the left ankle after sustained usage. (Windsor Decl. ¶ 12.) Dr. Windsor wrote, "(L) ankle worse [after] walking long time." (ECF No. 60-4 at 49.)

32. At the sick call appointment on September 30, 2014, defendant Dr. Windsor reviewed the orthopedic consultations, which recommended denovo cartilage surgery. Dr. Windsor offered plaintiff a re-evaluation by an orthopedic surgeon. (Windsor Decl. ¶ 12.)

33. By September 30, 2014, plaintiff was receiving a large dose of Oxcarbazepine and was willing to increase his current dosage. (Windsor Decl. ¶ 12.)

34. At the September 30, 2014 appointment, defendant Dr. Windsor declares that plaintiff informed Dr. Windsor that he did not want to have the denovo cartilage surgery, and Dr. Windsor noted this in the progress note. (Windsor Decl. ¶ 12; ECF No. 60-4 at 49.) Plaintiff declares that he "never at any point in time told Windsor that [plaintiff] did not want to have the denovo cartilage surgery." (ECF No. 77 at 3.) Plaintiff filed an administrative appeal stating he did not tell Dr. Windsor he wanted to hold off on the surgery, and alleging that Dr. Windsor made a false entry in plaintiff's medical records. (ECF No. 78 at 66, 68.)

35. On November 6, 2014, Dr. Windsor treated plaintiff for his report that his left ankle pain was not any less on Oxcarbazepine. (ECF No. 60-4 at 48.) Dr. Windsor assessed "trial of increased Oxcarbazepine. Then re-check and consider ortho re-evaluation. He wants to hold off on surgery at this time." (ECF No. 60-4 at 48.) Plaintiff denies he ever stated he wanted to hold off on surgery.

---

plaintiff's request for more methadone and the findings of the 9/25/2013 PMC meeting, that states: "After careful review of [plaintiff's] chart, imaging studies, functional status, and discussing it with both Psychiatry and other medical staff in the [PMC], it was agreed upon unanimously that [plaintiff] will be tapered off methadone altogether with NSAIDS and Tylenol on an as-needed basis for his pain and discomfort. There have been incidents of methadone diversion in the past by the patient." (ECF No. 81 at 13.)

36. Defendant Dr. Windsor again notified plaintiff that weight management would assist with the pain. (Windsor Decl. ¶ 13.)

37. When Dr. Lee reviewed plaintiff's treatment in November 2014, plaintiff was receiving alternative pain medications per protocol, advice on treating hypertension, and further opinions on the denovo cartilage surgery. (Lopez Decl. ¶ 13.)

38. Nothing in plaintiff's UHR shows that he was receiving inadequate treatment for his left ankle or that the condition required urgent treatment. (Lopez Decl. ¶¶ 13, 20.)

39. By December 2014, plaintiff agreed to continue working on weight management and hypertension to help with left ankle arthrosis. (Windsor Decl. ¶ 14.)

40. At no time during the nine months of treatment afforded plaintiff, did defendant Dr. Windsor discern that the ankle surgery was necessary rather than elective, or determine that a prescription for methadone or morphine was clinically necessary. (Windsor Decl. ¶ 15.)

41. Once defendant Dr. Windsor reviewed orthopedic consultation records, plaintiff informed her that he would rather be treated with pain medication than the surgery. (Windsor Decl. ¶ 15.) Plaintiff disputes this fact; he declares he never told Dr. Windsor that he did not want to have the surgery.[6] (ECF No. 78 at 3-4.)

42. By March of 2015, defendant Dr. Lankford treated plaintiff for complaints of left-ankle pain. (Lopez Decl. ¶ 7i.)

43.[7] On March 2, 2015, defendant Dr. Lankford noted that plaintiff's blood pressure remained hypertensive, at 156/94. (Lopez Decl. ¶ 7i.)

44. Defendant Dr. Lankford noted that plaintiff was unwilling to take medications to manage his blood pressure, but he should follow-up with regular blood pressure check-ups.

---

[6] In his request for second level review of appeal HDSP HC 14028473, plaintiff stated that he did not tell Dr. Windsor on September 30, 2014, that he wanted to hold off on the surgery; rather, he asked Dr. Windsor to keep him scheduled for the operation and refer him to the orthopedist for proper medication consideration. (ECF No. 78 at 49.) Plaintiff reiterated that he would only consider holding off on surgery if he was provided proper pain medication. (Id.)

[7] In response to UDF's 43-45, plaintiff points out that Dr. Lankford does not admit or deny that Dr. Lankford personally denied scheduling plaintiff's second left ankle surgery due to plaintiff's high blood pressure, and Dr. Lankford did not provide his own declaration in support of the instant motion. (ECF No. 77 at 4.) However, such failure does not render UDF's 43-46 disputed.

(Lopez Decl. ¶ 7i.)

45. Hypertensive blood pressure levels present additional complications to surgery including elevated risk for excessive bleeding, unstable heart rate, heart attack, or stroke. (Lopez Decl. ¶ 16.)

46. On March 4, 2015, a request for follow up with an orthopedist was completed, and by April 7, 2015, the referral for surgery had been completed and approved, and was pending scheduling. (ECF No. 78 at 46.)

47. In the third level appeal response to appeal 15029094, it was noted that on August 11, 2015, plaintiff received a Ketorolac injection to the left ankle joint, and recommendations were made for a repeat arthroscopy left ankle surgery; on August 13, 2015, left ankle surgery was scheduled. (ECF No. 78 at 94.)

48. Plaintiff had a second ankle surgery by Dr. Giza on September 4, 2015. (ECF Nos. 78 at 108; 81 at 15.) The MRI showed a posterior lateral tibial OCD lesion as well as a significant amount of subchondral edema. (ECF No. 78 at 109.) The post-operative diagnosis was: (1) Left ankle impingement, anterior soft tissue; (2) Left tibial osteochrondral defect; and (3) Left tibial trabecular fracture and cyst, subchondral. (ECF No. 78 at 108.)

49. In Dr. Giza's report, he noted that before the surgery, plaintiff was counseled on "operative versus nonoperative management," and plaintiff "elected for operative treatment." (ECF No. 78 at 109.) "Risks, benefits, and alternatives were discussed with [plaintiff]." (Id.)

50. Plaintiff denies he suffered a permanent injury as a result of defendants' course of treatment. (ECF No. 81 at 3.) Plaintiff has a job in vocation, and for exercise he runs, does burpies, pull-ups, and dips, and boxes a lot. (Pl.'s Dep. at 14-15.)

51. Plaintiff does not know who ordered plaintiff's second surgery. (Pl.'s Dep. at 86.)

VI. Summary Judgment Standards

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

////

Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." Walls v. Central Costa County Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

By contemporaneous notice provided on December 15, 2016 (ECF No. 60-1), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988). Also, the court earlier provided Rand notice on June 24, 2015. (ECF No. 15 at 3-4, 6.)

VII. The Parties' Arguments

1. Defendants' Positions

Defendants contend that plaintiff's second ankle surgery was delayed by plaintiff's health factors as well as his own reluctance. In the meantime, defendants argue that plaintiff received

pain medication and constant review of his condition which was medically acceptable under the circumstances.

Specifically, defendants argue that plaintiff has no evidence to support his deliberate indifference claims against each of the defendants. Dr. Windsor reviewed and updated plaintiff's medical treatment for almost a year, prescribing plaintiff multiple pain medications, and honoring plaintiff's request to not pursue denovo cartilage implantation surgery. Dr. Windsor considered the surgery to be elective, and advised plaintiff of ways to mitigate the pain, including weight loss and blood pressure management. Dr. Windsor found plaintiff's condition was managed appropriately, and did not diagnose a serious risk of harm to plaintiff. As to Dr. Lankford, defendants argue that once plaintiff requested surgery instead of pain medication, Dr. Lankford noted plaintiff's blood pressure levels remained hypertensive. In considering plaintiff's condition, Dr. Lankford notified plaintiff that hypertensive blood levels during the surgery put him at heightened risk for excessive bleeding, unstable heart rate, heart attack, or stroke. Dr. Lankford was aware of these life-threatening conditions that could result if plaintiff pursued elective condition in his condition. Dr. Lankford attempted to first remedy plaintiff's hypertension before surgery, but plaintiff was noncompliant. Defendants contend that Dr. Lee reviewed plaintiff's medical history in response to both appeals, and determined the course of treatment was medically acceptable under the circumstances. Dr. Lee noted a variety of treatments were being used, and plaintiff was being advised of other tactics to use to manage his pain in the interim. In addition, plaintiff had expressed reservations about the surgery, and his treating physician considered the surgery to be elective.

Finally, plaintiff's argument that defendant Mahoney was deliberately indifferent to plaintiff's pain management fails because Mahoney is not a trained physician, and is entitled to rely on the opinion of medically-trained physicians in reviewing medical treatments. (ECF No. 60-2 at 6.) Defendants argue that asking Mahoney to interfere with the diagnosis and treatment plan of a physician would require him to break the law and practice medicine without a license. (Id. at 6-7.) As to plaintiff's specific requests for methadone, notes from Pain Committee members at California State Prison, Sacramento reveal plaintiff had a history of selling

12

methadone.  In his deposition, plaintiff admitted to using pain medication recreationally.  (Id. at 35:5-6.)  Under these circumstances, giving plaintiff methadone would be professionally irresponsible.  Defendants contend that Mahoney's investigation and confirmation that plaintiff was receiving medically appropriate medications and alternative medication trials were being conducted, demonstrate Mahoney was not deliberately indifferent.

Defendants also contend that each defendant is entitled to qualified immunity because their treatment, review, and actions were reasonable under the circumstances.  (ECF No. 60-2 at 9-10.)

2.  Plaintiff's Opposition

Plaintiff argues that Dr. Windsor changed plaintiff's pain medication based on HDSP protocol which excludes prescriptions for methadone or morphine, relying on his appeal log no. 14028032 and its responses.  (ECF No. 78 at 2-3.)  Dr. Windsor admitted she applied this policy to plaintiff, citing defendants' answer.  (ECF No. 78 at 3, 34.)[8]  Dr. Lee reviewed plaintiff's medical records and saw he was "receiving medications according to protocol, and advice for how to minimize pain moving forward," demonstrating her awareness that the policy was being applied to plaintiff.  (ECF No. 78 at 3.)  CEO Mahoney was similarly made aware.  (Id.)

Plaintiff denies he ever told Dr. Windsor that plaintiff did not want to have the surgery, citing his appeal log nos. 14028473 (on September 10, 2014, plaintiff sought alternative surgery plan, and referral to orthopedic surgeon or outside doctor to prescribe adequate pain medication), and 14028663 (on November 12, 2014, plaintiff objected that despite Dr. Windsor's 9/30/14 medical record, plaintiff never told Dr. Windsor plaintiff wanted to hold off on surgery).  (ECF No. 78 at 4, 45-69.)  Defendants' position that the second ankle surgery was not necessary or not urgent is refuted by defendants' admission that an orthopedic surgeon recommended a second surgery for plaintiff's left ankle, citing defendants' answer.  (ECF No. 78 at 4, 33 ("Defendants

---

[8]  In their answer, defendants admit that plaintiff regularly complained of pain in his left ankle, that plaintiff was not enthusiastic about participating in the denovo cartilage implantation surgery, that Dr. Windsor explained to plaintiff HDSP's policy regarding methadone and morphine, and that plaintiff requested surgery after learning about HDSP's restrictions on methadone and morphine.  (ECF No. 78 at 33-34.)

13

admit that an Orthopedic Surgeon recommended a second surgery for plaintiff's left ankle.").)

Four different orthopedic surgeons recommended a second surgery for his left ankle:  Dr. Eric Giza, Dr. Jonathan G. Eastman, Dr. Kyle A. Mitsunaga,[9] and Dr. Richard Cross.  (ECF No. 78 at 4, 82; 85 (on April 19, 2010, "we will order an MRI . . . and plan for doing repeat surgical intervention in the form of ankle arthroscopy with denovo cartilage implantation"); 86 (May 13, 2010, "Dr. Giza wants to do a denovo cartilage implantation between the bones of the left ankle but wants an MRI beforehand"); 90 (Dr. Cross).)

In response to defendant Dr. Lankford's admission that plaintiff's high blood pressure prevented Dr. Lankford from scheduling plaintiff's denovo cartilage implantation surgery (answer at 3; ECF No. 78 at 34), plaintiff cites Dr. Lankford's April 7, 2015 interview during which Dr. Lankford reported he was going to schedule plaintiff for surgery, citing appeal log no. 15029094, first level response.  (ECF No. 78 at 5, 98 (on May 8, 2015, Dr. Lankford interviewed plaintiff, and the appeal response states plaintiff saw the orthopedic surgeon on May 14, 2015, and "will be scheduled for a left ankle arthroscopy.").)

Further, while plaintiff was housed at New Folsom State Prison, plaintiff contends that six different doctors determined that plaintiff needed 50 mg of methadone every day to manage plaintiff's excruciating pain:  Dr. Voung Duc; Dr. James Wedell; Dr. Dhillon; CME J. Bal; CEO Eureka Daye; and Dr. Behroz Hamkar.  (ECF No. 78 at 8, 101-06.)  Defendants failed to provide plaintiff the pain medication that had worked for years based on HDSP policy, rather than determining methadone was not an appropriate medication for plaintiff based on his serious pain needs.  (ECF No. 78 at 8, citing Chess v. Dovey, 790 F.3d 961 (9th Cir. 2015) (Chess alleged that defendants discontinued methadone solely because HDSP policy in 2006 to 2007 prohibited general population inmates from receiving that medication.).)  Plaintiff contends that defendants concede that the HDSP policy exists, citing their answer.  (ECF No. 78 at 12, 34.) ("Defendants admit plaintiff was interviewed by Dr. Windsor, where she explained HDSP's policy regarding methadone and morphine;" "Defendants admit that plaintiff requested surgery after learning about

---

[9]  Dr. Eastman and Dr. Mitsunaga were residents for Dr. Giza.  (ECF No. 78 at 83, 85.)

1  HDSP's restrictions on methadone and morphine.")

2      Plaintiff argues that Drs. Windsor and Lee were deliberately indifferent to plaintiff's need

3  for additional pain medication and for the second ankle surgery because plaintiff was for years

4  prescribed methadone for pain management, and were aware that plaintiff filed three separate

5  appeals requesting surgery, and knew that three different orthopedic surgeons at U.C. Davis

6  recommended that plaintiff receive the second surgery, confirmed his constant pain, and that he

7  would suffer cartilage injuries leading to arthritis if he did not receive the second surgery.  (ECF

8  No. 78 at 9; 10-11.)  The 18 month delay in receiving the second surgery resulted in further

9  significant injury to his left ankle, supported by the post-operative report by Dr. Jackson (ECF

10  No. 78 at 108-11) (posterior lateral tibial OCD lesion, significant amount of subchondral edema,

11  extensive scarring, and a loose body within the joint), as well as pain.  (ECF No. 78 at 10-11.)

12      Further, plaintiff argues that CEO Mahoney knew plaintiff was previously prescribed

13  methadone for seven years for pain, but denied plaintiff this medication under the HDSP policy,

14  citing administrative appeal log no. 14028032.  Administrative staff can be found deliberately

15  indifferent where staff knowingly fails to respond to an inmate's request for help, or have reason

16  to believe that prison medical staff are mistreating or not treating a prisoner, and CEO Mahoney

17  knew of two appeals in which plaintiff requested adequate pain medication.  (ECF No. 78 at 13-

18  14, citing appeal nos. 14028252 and 15029094.)  Plaintiff disputes Mahoney's claim that plaintiff

19  sold methadone; plaintiff never received a prison disciplinary for selling methadone, and never

20  admitted to using pain medication recreationally.  (ECF No. 78 at 15.)

21      On April 7, 2015, Dr. Lankford interviewed plaintiff for appeal log no. 15029094, and

22  told plaintiff that prescribing any type of pain medication will not help plaintiff's pain, and

23  recommended plaintiff be scheduled for surgery so no pain medication would be needed.  (ECF

24  No. 78 at 15, citing appeal no. 15029094.)  Although Dr. Lankford discussed plaintiff's high

25  blood pressure with him, plaintiff denies he was told in the appeal interview that Dr. Lankford

26  would refuse to recommend the second surgery due to plaintiff's high blood pressure.  Dr.

27  Lankford is the only doctor who used plaintiff's high blood pressure as an excuse not to perform

28  the second surgery.  None of the other prison doctors, Dr. Duc, Dr. Wedell, CME Bal, Dr.

Dhillon, or CEO Daye, or UCD surgeons, Dr. Giza, Dr. Eastman, or Dr. Mitsunaga, reported that plaintiff's high blood pressure would prevent his first left ankle surgery. (ECF No. 78 at 16.) Similarly, Dr. Lee, Dr. Swingle, CEO Mahoney, Dr. Cross, or Dr. Abdur-Rahman did not report that plaintiff's high blood pressure should prevent plaintiff from having the second surgery. Plaintiff argues that the failure of these other doctors to record such concerns demonstrates that Dr. Lankford fabricated the high blood pressure as an excuse to discredit plaintiff's claims in this action. Despite Dr. Lankford initially stating he was going to recommend the second surgery (ECF No. 78 at 93, 98), Dr. Lankford then fabricated the high blood pressure excuse to delay plaintiff's second surgery and deny plaintiff pain medication. Plaintiff contends that Dr. Giza's report shows that if plaintiff's left ankle went untreated, cartilage injuries of the ankle can lead to early arthritis, and pain with every step. (ECF No. 78 at 85-87.) Further, he argues that the operational procedure shows proof of such injury. (ECF No. 78 at 17, 108-11.)

Plaintiff argues defendants are not entitled to qualified immunity because they were aware they could not be deliberately indifferent to plaintiff's need for effective pain relief or, in the alternative, surgery to alleviate such pain. Each defendant refused to respond to or acknowledge the U.C. Davis orthopedic surgeons' recommendations that plaintiff receive the second surgery. Indeed, they even refused to note that plaintiff appended such recommendations to his appeals. Such callous disregard for these specialists' recommendations demonstrates defendants are not entitled to qualified immunity. (ECF No. 78 at 19-20, citing Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012) (decision of non-treating, nonspecialist physicians to repeatedly deny recommended surgical treatment may be medically unacceptable under all the circumstances); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012) (doctor's awareness of need for treatment followed by his unnecessary delay in implementing the prescribed treatment sufficient to plead deliberate indifference).)

3. Defendants' Reply

Defendants argue that plaintiff failed to provide credible evidence to demonstrate a dispute of material fact remains. Rather, defendants maintain that plaintiff contradicted his prior, sworn testimony and pleadings, and made inadmissible assertions. Defendants argue that

plaintiff's new assertions in his opposition are insufficient to create a genuine issue of material fact. Specifically, contrary to plaintiff's opposition, plaintiff conceded in his deposition that he did not like the surgical option and agreed to receive pain medication in lieu of the surgery. (ECF No. 80 at 2, citing Pl.'s Dep. at 23-24.) Indeed, in his complaint, plaintiff declared his lack of enthusiasm under penalty of perjury. (ECF No. 1 at 4.) Defendants contend this demonstrates plaintiff preferred pain management over the surgery.

### 4. Plaintiff's Sur-Reply

Plaintiff argues that he did not contradict his prior deposition testimony. He denies that at any point in time he agreed to receive pain medication in lieu of surgery. (ECF No. 81 at 2.) Plaintiff denies that he asserts he suffered permanent injury as a result of defendants' course of treatment. (ECF No. 81 at 3.) As to Dr. Lankford, plaintiff contends it is Dr. Lankford who contradicted himself by his documented, reported statements, and plaintiff claims Dr. Lankford has been aware of this civil complaint "from the beginning." (ECF No. 81 at 3.)

In response to defendants' claim that plaintiff's condition did not warrant the care he received from prior institutions or the recommendations from outside specialists, and that plaintiff's second surgery was elective, not necessary, plaintiff responds that while he was housed at New Folsom State Prison he was receiving 50 mg of methadone every day, demonstrating plaintiff suffered excruciating pain, and the report from the second surgery demonstrates his left ankle was seriously damaged, requiring surgery, and thus was not "elective." (ECF No. 81 at 4.) Plaintiff argues that for 18 months defendants intentionally allowed plaintiff to suffer unbearable, excruciating pain by delaying the surgery.

Further, plaintiff denies he has a history of selling methadone; defendants failed to identify any person who reported or witnessed such activity, plaintiff has sustained no rules violation report for such activity, and none of the pertinent administrative appeals includes such allegations. Rather, such allegation only surfaced after plaintiff filed the instant complaint. Plaintiff also provided duplicate exhibits previously appended to his opposition. (ECF No. 78 at 101-11.)

////

VIII.  Legal Standards

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes
> to be subjected, any citizen of the United States . . . to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution . . . shall be liable to the party injured in an action at
> law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

While the Eighth Amendment of the United States Constitution entitles plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082–83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).  The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care.  Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.

18

"A difference of opinion between a physician and the prisoner -- or between medical professionals -- concerning what medical care is appropriate does not amount to deliberate indifference." Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)); Wilhelm, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted). Deliberate indifference may be found if defendants "deny, delay, or intentionally interfere with [a prisoner's serious need for] medical treatment." Hallet v. Morgan, 296 F.3d 732, 734 (9th Cir. 2002).

In order to prevail on a claim involving defendants' choices between alternative courses of treatment, a prisoner must show that the chosen treatment "was medically unacceptable under the circumstances" and was chosen "in conscious disregard of an excessive risk to plaintiff's health." Jackson, 90 F.3d at 332. In other words, so long as a defendant decides on a medically acceptable course of treatment, his actions will not be considered deliberately indifferent even if an alternative course of treatment was available. Id.

IX. Discussion

A. Serious Medical Need

The parties do not dispute, and the undersigned finds, that based upon the evidence presented by the parties in connection with the pending motion, a reasonable juror could conclude that plaintiff's left ankle condition constitutes an objective, serious medical need. See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment."); see also Canell v. Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the Eighth Amendment duty to provide medical care applies "to medical conditions that may result in pain and suffering which serve no legitimate penological purpose."). Specifically, plaintiff's largely undisputed medical

19

history, as well as the observations and treatment recommendations by the defendant medical providers as well as plaintiff's outside surgeon Dr. Giza, compel the conclusion that plaintiff's medical condition, if left untreated, could result in "further significant injury" and the "unnecessary and wanton infliction of pain." McGuckin, 974 F.2d at 1059.

    B. Deliberate Indifference

        1. Methadone Discontinued for Policy Reasons?

Plaintiff contends that his prescription for methadone was discontinued for non-medical reasons, based on an alleged policy at HDSP that inmates may not receive methadone or morphine prescriptions. Although such allegation was sufficient to support his claim for deliberate indifference on screening, at summary judgment plaintiff must go beyond the pleadings and designate specific facts to show a material dispute of fact exists for trial. Celotex Corp., 477 U.S. at 324. Plaintiff has not done so. Plaintiff has provided no HDSP policy that supports his position. Plaintiff provided no discovery responses that confirm such a policy exists at HDSP. Rather, plaintiff submitted his 602 appeal log no. 14028032 to support his position. (ECF No. 78 at 3; 22-30.) However, the appeal responses do not confirm the existence of a policy banning such prescriptions. Rather, both Dr. Lee and CEO Mahoney stated that "There is no policy 'refusing' patients access to appropriately prescribed morphine or methadone." (ECF No. 78 at 27, 29.) Thus, the appeal responses provided by plaintiff suggest a more nuanced policy, if it can be called a policy, at HDSP: doctors "do not refuse patients access to **appropriately** prescribed morphine or methadone." (ECF No. 78 at 27 (emphasis added).) Such statement reflects that the prescription of morphine or methadone is not prohibited, but that the doctor must determine that it is medically appropriate for the prisoner to receive morphine or methadone. Indeed, plaintiff was prescribed morphine at HDSP following his September 2015 left ankle surgery. (ECF No. 78 at 94-95.)

Nevertheless, even if Dr. Windsor told plaintiff that no inmate receives prescriptions for methadone or morphine at HDSP, the evidence shows that defendant Dr. Windsor first examined plaintiff's ankle on March 24, 2014, and noted that plaintiff was "using a cane, left ankle with limited range of motion but ok with ambulation with modified position." (ECF No. 60-4 at 57.)

"Check x-ray -- [plaintiff] says he will not get it -- he wants ortho referral but to use MRI from 2009." (Id.) Plaintiff requested methadone, but Dr. Windsor charted that plaintiff said, "Yea, I know, it's a bad drug!" and plaintiff refused Tylenol #3. (Id.) Thus, Dr. Windsor evaluated plaintiff's condition, and determined in the doctor's medical opinion that methadone was not required. Plaintiff provides no competent medical evidence to the contrary. Therefore, Dr. Windsor's alleged statement does not support a finding of deliberate indifference. Beyond plaintiff's statement, he offers no evidence to support his view that Dr. Windsor changed plaintiff's pain medication based solely on an alleged prison policy rather than plaintiff's medical condition or based on Dr. Windsor's medical judgment.

Accordingly, plaintiff's claim that he was denied methadone based on an HDSP policy that no inmate be prescribed methadone should be dismissed.

### 2. Interference with or Delay of Dr. Giza's Recommendation

On April 19, 2010, plaintiff was seen and examined by Dr. Eastman and Dr. Giza at U.C. Davis for complaints of persistent ankle pain, swelling, catching, and locking. (ECF No. 78 at 85.) The doctors felt there was still a lesion in his talus that was causing his symptoms, and ordered an MRI with a "plan for doing repeat surgical intervention in the form of ankle arthroscopy with de novo cartilage implantation." (Id.)[10] On May 13, 2010, per Dr. Giza's recommendation, Dr. Ali submitted a request for an MRI of plaintiff's left ankle, which was approved on May 18, 2010. (ECF No. 78 at 86.) In his verified complaint, plaintiff states that medical staff at New Folsom, where plaintiff was housed, postponed the de novo cartilage implantation in favor of putting plaintiff on a pain management medication of methadone. (ECF No. 1 at 4.) Plaintiff claims methadone or morphine were the only medications that relieved the "unbearable, excruciating pain that [he] was suffering from every day, 24 hours a day." (Id.) Plaintiff concedes that he was in favor of this medication management because he was "not enthusiastic" about the de novo cartilage implantation procedure, "this procedure is brutal!" (Id.)

---

[10] Handwritten by Dr. Giza's plan is "RFS for surgery." (ECF No. 78 at 85.) However, it is unclear who wrote this entry. The following request for services form requests only a routine MRI, not a surgery, although the proposed second surgery is noted as the medical necessity for the MRI. (ECF No. 78 at 86.)

The record confirms that plaintiff was taking methadone before he transferred to HDSP. (ECF No. 78 at 103, 106; 81 at 8.)  But neither party provided a medical record or other document confirming that a medical professional made a decision that plaintiff would receive methadone instead of the de novo cartilage implantation surgery.  In his deposition, plaintiff testified that he was going to have the surgery, but someone at CDC got in contact with Dr. Giza, and the doctors put plaintiff on methadone instead of giving him the surgery.  (Pl.'s Dep. at 46.)  But plaintiff also conceded that he still thought the surgery was "brutal" (id.), "never asked for the surgery while he was on medications [methadone or morphine]" (id. at 26), and apparently did not challenge the failure of medical staff to follow Dr. Giza's 2010 recommendation for an MRI and the second surgery.  On August 28, 2012, Dr. Wedell noted that plaintiff refused an ankle MRI in September 2010.  (ECF Nos. 78 at 103; 81 at 10.)

In light of such record, the actions or inactions of medical staff at HDSP in 2014 and 2015 cannot be construed as deliberate indifference to, or interference with, Dr. Giza's 2010 recommendations.

### 3.  Refusal to Prescribe Methadone/Inadequate Pain Medication

To the extent plaintiff argues that because he was prescribed methadone for seven years, it was deliberate indifference for defendant doctors at HDSP to refuse to prescribe such medication, such claim is unavailing for the following reasons.

It is well established that "a mere difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference."  Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004) (alterations in original) (citation omitted).  This rule applies whether the difference is between the medical professionals and a prisoner or two or more medical professionals.  Hamby v. Hammond, 821 F.3d 1085, 1092 (9th Cir. 2016) (citation omitted).  In an appropriate case, however, a prisoner may demonstrate deliberate indifference based on a difference of medical opinion, but must show that "the course of treatment the doctors chose was medically unacceptable under the circumstances," and that they "chose this course in conscious disregard of an excessive risk to [the prisoner's] health."  Jackson, 90 F.3d at 332 (citations omitted).

In 2012, plaintiff was taking 20 mg of methadone twice a day.  (ECF No. 78 at 103.)  By

2013, plaintiff was taking 50 mg twice a day, but Dr. Hamkar at CSP-SAC charted that plaintiff "has been on methadone off and on in the past." (ECF No. 78 at 106.) In his deposition, plaintiff testified that he had been on methadone "off and on" for about seven years. (Pl.'s Dep. at 30.) Importantly, Dr. Hamkar noted that following discussions with psychiatry and other medical staff in the PMC, it was unanimously agreed that plaintiff would be tapered off methadone altogether with NSAIDs and Tylenol on an as-needed basis for his pain and discomfort. (ECF No. 78 at 106.) Although the parties disagree on the reason why the methadone was tapered off, plaintiff conceded in his deposition that the methadone was being tapered off while he was housed at CSP-SAC. (Pl.'s Dep. at 28, 34.) Thus, it is undisputed that in September of 2013, plaintiff was being weaned from methadone prior to his transfer to HDSP. Plaintiff was not transferred to HDSP until March of 2014. It is unclear whether plaintiff was taking methadone when he arrived at HDSP, or, if he was, at what dose. But it is undisputed that he was not prescribed methadone at HDSP between March 2, 2014, and September 4, 2015. Dr. Hamkar's decision to taper plaintiff off methadone supports Dr. Windsor's decision not to prescribe methadone for plaintiff.

Further, the record reflects that Dr. Windsor provided medical treatment for plaintiff's left ankle, including referrals for physical therapy and orthopedic evaluations, lab work, an MRI, and prescriptions for Oxcarbazepine, Naproxen and nortriptyline for pain. (ECF Nos. 60-4 at 50, 58, 62, 64; 78 at 30, 46-47.) Dr. Lee approved the requests for physical therapy and orthopedic evaluation. (ECF No. 60-4 at 62, 64.) In the meantime, plaintiff started dieting, and reduced his weight from 250 to 204. (Pl.'s Dep. at 39.) Plaintiff testified that this was helpful "to a degree." (Pl.'s Dep. at 40.) Plaintiff was provided a cane, medical vest, lower bunk and lower tier chronos, and chronos restricting him from lifting over 19 pounds or walking up inclines or steps. (Pl.'s Dep. at 38.) Plaintiff testified that the pain did not keep him from performing his activities of daily living. (Pl.'s Dep. at 42-43.)

In his deposition, plaintiff initially denied refusing other medications. (Pl.'s Dep. at 36.) But later he admitted that he refused Motrin and Tylenol, despite conceding that such anti-inflammatory medications would be of some benefit for the swelling, testifying that they did not assist with the pain. (Pl.'s Dep. at 37-38.) Moreover, on April 16, 2014, plaintiff signed a refusal

23

of treatment form: "refuses NSAIDs, Tylenol, and Tylenol #3." (ECF No. 60-4 at 63.)  Medical records also show that plaintiff refused alternative medications.  On March 24, 2014, refused Tylenol #3.  (ECF No. 60-4 at 57.)  On August 14, 2014, plaintiff refused nortriptyline.  (ECF No. 60-4 at 52.)  On September 8, 2014, "chronic pain refusing med."  (ECF No. 60-4 at 50.)  Plaintiff declares that no drugs other than methadone or morphine eased his pain, but he provides no medical records from his medical care prior to HDSP to support such a claim.  When plaintiff reported to Dr. Windsor that the pain medications prescribed were not working, Dr. Windsor adjusted the medications she did prescribe.  (ECF No. 60-4 at 15, 17, 19, 22, 27, 29, 34, 49.)  In addition, Dr. Lankford prescribed Naproxen, 500 mg., for three months.  (ECF No. 60-4 at 10.)

Further, medical records also show that for periods of time plaintiff took no pain medication.  (ECF No. 60-4 at 52 (August 14, 2014, refusing nortriptyline); 60-4 at 41 (January 21, 2015, on no pain medications).  By February 1, 2015, plaintiff reported his left ankle pain was 7/10 with no pain medications.  (ECF No. 60-4 at 38.)  Such records, taken with plaintiff's concession that he was previously "off and on" morphine, suggest that plaintiff's pain complaints were, at a minimum, inconsistent.  Although he presented with complaints of left ankle pain throughout his appointments, he provided no health care request forms consistently complaining of severe ankle pain.  Rather, some of his medical records reflect complaints that he suffered pain with weight bearing, or sharp with extended constant ambulation; worse with use; and "worse after walking long time."  (ECF No. 60-4 at 45, 49, 57.)

Moreover, plaintiff saw Dr. Cross on August 25, 2014, specifically noting plaintiff's left ankle pain without swelling, x-ray showed mild post-traumatic DJD, but Dr. Cross did not recommend pain medication for plaintiff.  (ECF No. 60-4 at 62.)  Similarly, on September 8, 2014, Dr. Cross again did not recommend pain medication.  (ECF No. 60-4 at 62; 78 at 90.)  Dr. Abdur-Rahman saw plaintiff on January 25, 2015, following the MRI, and also did not prescribe pain medication for plaintiff, despite plaintiff not being on medication at the time.  (ECF No. 60-4 at 41-42.)

Finally, defendants have provided the declaration of S. Lopez, Chief Medical Executive at Kern Valley State Prison, and practicing physician in the field of internal medicine since 1999.

(ECF No. 79.)  Dr. Lopez reviewed plaintiff's medical records and noted that plaintiff's pain symptoms were inconsistent, and it was reasonable for Dr. Windsor to recommend lower risk pain management and physical therapy in July of 2014, and that high risk pain management options were unnecessary.  (ECF No. 79 at 6.)  Dr. Lopez opined that Dr. Windsor's subsequent treatment was reasonable.  When plaintiff refused nortriptyline, Dr. Windsor sought a second opinion and orthopedic evaluation for plaintiff's left ankle.  (Id. at 7.)  On September 8, 2014, Dr. Windsor increased plaintiff's medication, advised plaintiff of ways to minimize weight-bearing pain, and was considering follow-up surgery following review of records from orthopedic consultations.  (Id.)  On September 30, 2014, Dr. Windsor increased plaintiff's prescription for oxcarbazepine, and offered plaintiff a re-evaluation by an orthopedic surgeon.  On November 6, 2014, Dr. Windsor increased plaintiff's prescription for oxcarbazepine, and advised that weight management could assist with weight-bearing pain.  By December 1, 2014, plaintiff was encouraged to monitor his weight and hypertension.  (ECF No. 79 at 10.)  By March of 2015, plaintiff was advised of his hypertensive blood pressure levels by Dr. Lankford, but plaintiff was unwilling to take blood pressure medications to stabilize his blood pressure prior to surgery. Plaintiff's pain was being treated with acetaminophen.  (ECF No. 79 at 7.)  On March 2, 2015, Dr. Lankford prescribed Naproxen, 500 mg., for three months.  (ECF No. 60-4 at 10.)  Plaintiff did not rebut Dr. Lopez' declaration with his own medical expert opinion.

Plaintiff's disagreement with Dr. Windsor and Dr. Lankford about the type and strength of his pain medication does not reflect a conscious disregard of plaintiff's serious medical needs.  In short, based on the record before the court, the doctors' refusal to provide plaintiff with methadone or a stronger pain medication plaintiff preferred did not rise to the level of deliberate indifference in violation of the Eighth Amendment.  See McGuckin, 974 F.2d 1050 (a defendant "must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established."); see also Parlin v. Sodhi, 2012 WL 5411710 at *4 (C.D. Cal. Aug. 8, 2012) ("At its core, plaintiff's claim is that he did not receive the type of treatment and pain medication that he wanted when he wanted it.  His preference for stronger medication -- Vicodin, Tramadol, etc., -- represents precisely the type of difference in medical

opinion between a lay prisoner and medical personnel that is insufficient to establish a constitutional violation."); Tran v. Haar, 2012 WL 37506 at *3-4 (C.D. Cal. Jan. 9, 2012) (plaintiff's allegations that defendants refused to prescribe "effective medicine" such as Vicodin and instead prescribed Ibuprofen and Naproxen reflected a difference of opinion between plaintiff and defendants as to the proper medication necessary to relieve plaintiff's pain and failed to state an Eighth Amendment claim).

Thus, for all of the above-discussed reasons, the undersigned cannot find that defendants' failure to prescribe methadone or morphine for plaintiff's left ankle pain was medically unacceptable under the circumstances or that the course of treatment chosen by Dr. Windsor and Dr. Lankford for plaintiff's pain complaints was chosen in conscious disregard of an excessive risk to plaintiff's health. Consequently, because the record reflects that plaintiff was receiving appropriate medical treatment by Dr. Windsor, plaintiff's claims that Dr. Lee or CEO Mahoney should have taken additional steps concerning plaintiff's pain complaints when they reviewed plaintiff's 2014 appeals also fail. Defendants are entitled to summary judgment.

### 4. Was the Surgery Emergent?

In Snow, the outside orthopedic surgeon and the prisoner's treating physician considered the requested surgery to be an emergency. See id. at 986. Here, Dr. Giza and Dr. Cross did not recommend that plaintiff be provided urgent or emergency surgery.[11] Indeed, plaintiff waited over four years since Dr. Giza recommended the surgery to begin demanding surgery. Moreover, the medical records reflect that Dr. Giza counseled plaintiff before the second surgery, making sure that plaintiff wanted operative rather than nonoperative care. (ECF No. 78 at 109.) Dr. Giza's medical record supports defendants' position that the second surgery was elective and not emergent. Finally, defendants submitted the expert declaration of Dr. Lopez who opined that the corrective surgery that the orthopedic specialists recommended is considered elective. (ECF No. 79 at 8.) Dr. Lopez also found that if there were complications in the treatment process, Dr. Lopez would expect to see records from the orthopedic experts noting that plaintiff's condition

---

[11] Following Dr. Giza's 2010 recommendation, Dr. Ali marked the May 13, 2010 request for MRI as "routine." (ECF No. 78 at 86.)

1   was becoming urgent, and such records were not present.  (ECF No. 79 at 9.)

2                5.  Delay in Surgery Once at HDSP

3         By the time plaintiff was transferred to HDSP in March of 2014, almost four years had

4   passed since Dr. Giza's 2010 recommendation.  But plaintiff experienced further delay between

5   June 22, 2014, when he clearly requested the second surgery in his appeal no. 14028252 (ECF

6   No. 78 at 71), and September 4, 2015, when the second surgery took place.  Nevertheless, after

7   review of the record, and for the following reasons, the undersigned finds that plaintiff has failed

8   to rebut defendants' evidence that Dr. Windsor, Dr. Lee and Dr. Lankford were not deliberately

9   indifferent to plaintiff's need for surgery following his transfer to HDSP.

10                A.  Various Reasons for Delay

11                i.  UCD Records Not in Plaintiff's UHR

12        Dr. Windsor requested that plaintiff be referred to ortho on July 30, 2014, and Dr. Lee

13  approved the request on August 5, 2014.  (ECF No. 60-4 at 62.)  On August 25, 2014, Dr. Cross

14  examined plaintiff, noting left ankle pain without swelling; x-ray showed mild post-traumatic

15  DJD, and requested UCD clinic notes regarding the need for additional surgery, and would

16  follow-up at the next ortho clinic when the records were obtained.  (ECF No. 60-4 at 62.)

17        Thus, part of the delay in plaintiff receiving the second surgery was because the records

18  from UCD were not part of plaintiff's UHR.  Because these records were not part of plaintiff's

19  UHR, it appears that Dr. Cross and Dr. Windsor were not aware that Dr. Giza had recommended

20  that plaintiff receive an MRI prior to the second surgery.  And, Dr. Wedell noted that plaintiff had

21  refused an ankle MRI in September 2010.[12]  (ECF Nos. 78 at 103.)  Thus, there were no MRI

22  results following Dr. Giza's 2010 recommendation for defendants or Dr. Cross to review.

23  Plaintiff does not attribute the delay in receiving records from UCD to any of the named

24  defendants, but it appears such delay was nominal in any event.

25  ////

26  ////

27  _____

    [12]  Indeed, on March 24, 2014, it was charted that plaintiff "wants ortho referral, but to use MRI
28  from 2009."  (ECF No. 60-4 at 57.)

                                    27

## ii. Delay in Receiving MRI

On September 8, 2014, Dr. Cross noted he had reviewed the operative report and UC Davis Medical Center's recommendations for another MRI and if the findings were consistent with a "persistent lesion then possible DeNovo cartilage transplantation to this ankle joint." (ECF No. 78 at 90.)  Dr. Cross found the request reasonable, stating "this is a reasonable and appropriate procedure if the MRI, which I do not have a report of being done or completed, is significant for persistent full osteochondral lesion of his talus."  (ECF No. 78 at 90.)  On the physician request for services form, Dr. Cross noted the examination was unchanged, and wrote, "pending positive finding on MRI, then referral to UCD for discussed procedure is appropriate. Follow-up p.m."  (ECF No. 60-4 at 61.)

Dr. Windsor saw plaintiff later on September 8, 2014, noting plaintiff's request for pain medication and plans for surgery again, "no UCD ortho report in UHR," and wrote "obtain UCD records."  (ECF No. 60-4 at 50.)  Despite Dr. Cross' note that he did not have MRI results, Dr. Windsor did not order an MRI on September 8, 2014, or in her September 30, 2014 progress note after she had reviewed the ortho records.  (ECF No. 60-4 at 50.)  Moreover, even though Dr. Windsor wrote "check MRI" in her December 1, 2014 progress note, no MRI had been done between September 8, 2014, and December 1, 2014.  (ECF No. 60-4 at 44.)  Dr. Windsor had seen plaintiff three times in between.  (ECF No. 60-4 at 48, 49.)  Dr. Windsor did not address the issue of the delayed MRI in her declaration.  (Windsor Decl. at ¶¶ 11-14.)  But Dr. Windsor did not order the MRI until December 1, 2014.  (ECF No. 60-4 at 58; 14.)  The MRI was done on January 9, 2015.  (ECF No. 78 at 53.)  Thus, plaintiff's MRI for his second surgery was delayed from September 8, 2014, until January 9, 2015.

## iii. Plaintiff's Ambivalence

In the meantime, however, plaintiff filed appeal no. 14028473 on September 10, 2014, stating he was "scheduled for ankle de novo cartilage implantation at U.C. Davis Medical Hospital.  Via Inter[net] my family sent me, and requested (1) alternative surgery plan, (2) orthopedic surgeon and/or doctor to prescribe . . . adequate pain medication."  (ECF No. 78 at 48.)  Plaintiff stated he was "not too enthusiastic about actual extensive scar tissue that's

associated with this type of surgery," . . . nor . . . keen on the possibility that [he] may need ankle support for up to one year after surgery," and did not like that a prosthesis would be implanted into his ankle. (ECF No. 78 at 50.) Plaintiff reiterated he was not too enthusiastic about this "major surgery," but "due to [his] every day high level pain activity," was "willing to participate in this extreme surgery." (Id.) Plaintiff stated he would "be willing to discontinue this horrible experience if HDSP will allow a proper experienced orthopedic surgeon and/or doctor to prescribe [him] adequate pain medication." (Id.) Plaintiff completed the "action requested" portion by writing: "(1) Alternative surgery plan, (2) Orthopedic surgeon and/or doctor to prescribe me adequate pain medication." (Id.)

On September 30, 2014, Dr. Windsor interviewed plaintiff for the first level review of appeal no. 14028473, reiterating plaintiff's two issues: (a) requests alternate surgery plan from what had been discussed with ortho for foot surgery; and (b) be prescribed adequate pain medication. (ECF No. 78 at 54.) Dr. Windsor charted that plaintiff "wanted to hold off on surgery at this time," and agreed to try increased pain medication. (ECF No. 78 at 54.) On November 13, 2014, defendant Dr. Lee partially granted plaintiff's first level appeal, noting plaintiff had declined surgery, and his pain medication was being increased, and would be re-evaluated at the scheduled follow-up appointment. (ECF No. 78 at 54.) On November 19, 2014, plaintiff filed a request for second level review, emphatically stating that he "never ever at no point on the date of 9/30/14 told Dr. Windsor that I wanted to hold off on my surgery." (ECF No. 78 at 49.) Plaintiff insisted that he asked Dr. Windsor to keep plaintiff scheduled for the operation and refer him to orthopedics for proper medication consideration. (ECF No. 78 at 49.) Plaintiff emphasized that if he received proper medication, "then and only then [would he] consider holding off on surgery." (Id.)

Thus, even if there had been a miscommunication between Dr. Windsor and plaintiff concerning the de novo cartilage implantation surgery, plaintiff's appeal makes clear that he was ambivalent about such surgery and, in fact, specifically requested an "alternative surgery plan." Therefore, plaintiff's actions contributed to the delay of the second surgery.

////

iv. <u>Post-MRI Delay</u>

On January 21, 2015, Dr. Abdur-Rahman saw plaintiff for complaints of left ankle pain at "a cross-coverage Out-to-Medical follow-up visit on D Yard." (ECF No. 60-4 at 41.) Dr. Abdur-Rahman reviewed the MRI: "shows no acute fracture, intact ligaments and tendon, moderate ankle arthritis and additional nonemergent findings." (ECF Nos. 60-4 at 41; 78 at 113.) Dr. Abdur-Rahman reiterated the report of Dr. Cross, who found the denovo cartilage transplantation surgery should occur <u>if</u> the MRI "is significant for persistent full osteochondral lesion of his talus." (ECF No. 60-4 at 41.) Dr. Abdur-Rahman charted that "[i]n the MRI it is stated that there is <u>moderate</u> tibial talar articular cartilage thinning greater laterally." (<u>Id.</u> (emphasis added).) Plaintiff was on no pain medications. Dr. Abdur-Rahman recommended diet, exercise and weight loss. Notably, Dr. Abdur-Rahman did not recommend surgery or refer plaintiff back to ortho. (ECF No. 60-4 at 41-42.)

On February 17, 2015, plaintiff was seen by RN Hubbard for left ankle pain. (ECF No. 60-4 at 38.) Hubbard wrote that plaintiff

> states was supposed to have another surgery but was cancelled because MRI not done; went for MRI, then follow-up on January 27, 2015, and that appointment PCP stated plan was to send for ortho follow up as already scheduled by previous PCP, but per conversations with inside and outside specialists, the RFS was never written. Will return to PCP to follow up and hopefully get an RFS for ortho follow-up.

(ECF No. 60-4 at 40.) Because Dr. Abdur-Rahman was the doctor who reviewed plaintiff's MRI results with plaintiff, it appears that Dr. Abdur-Rahman could have requested that plaintiff be referred back to ortho. However, Dr. Abdur-Rahman read the MRI with the benefit of Dr. Cross' recommendation and did not make such recommendations. Thus, it appears that any delay stemming from nonparty Dr. Abdur-Rahman's failure to refer plaintiff back to ortho constitutes a difference of opinion. Plaintiff adduced no evidence that any of the named defendants were responsible for referring plaintiff back to ortho in light of Dr. Abdur-Rahman's failure to do so on February 17, 2015.

Dr. Windsor saw plaintiff again on April 16, 2015, at which time she noted abnormal musculoskeletal exam, but plaintiff had no swelling in left ankle and had good range of motion.

(ECF No. 60-4 at 55.)  There was no mention of surgery in her progress note.  (Id.)

## B. Was the Delay Deliberately Indifferent?

### i. Dr. Windsor

For all of the above reasons, the undersigned cannot find that Dr. Windsor was deliberately indifferent based on the delay in plaintiff's second surgery.  While it appears that Dr. Windsor may have been responsible for some delay in seeking the MRI, such delay occurred during the same period plaintiff was seeking an alternative to the surgery plan recommended by the orthopedist specialist.  Such ambivalence, written in plaintiff's own hand in his appeal, as well as included in his verified complaint, was sufficient to warrant Dr. Windsor's delay in pursuing the MRI or the second surgery.  As discussed above, Dr. Windsor saw plaintiff frequently, and provided him with physical therapy, referrals to orthopedic specialists, and prescriptions to various pain relievers.  Dr. Windsor encouraged plaintiff to lose weight and monitor his hypertension.  In addition, plaintiff was often a difficult patient, demanding particular medications, and refusing to follow the doctor's advice.

On this record, Dr. Windsor is entitled to summary judgment as plaintiff fails to demonstrate "the existence of genuine issues for trial."  Oracle Corp., 627 F.3d at 367 (citing Celotex, 477 U.S. at 323.)

### ii. Dr. Lee

Because the undersigned finds Dr. Windsor's treatment was constitutionally permissible, Dr. Lee's review of such treatment also fails to rise to the level of deliberate indifference.  In appeal no. 14028252, Dr. Lee noted plaintiff was being referred to an orthopedic doctor for evaluation in response to the request for the second surgery.  (ECF No. 78 at 75.)  In appeal no. 14028473, as discussed above, Dr. Lee noted on November 13, 2014, that plaintiff was seeking an alternate surgery plan.  (ECF No. 78 at 54.)  As opined by Dr. Lopez, by November of 2014, plaintiff's medical records showed that plaintiff had tried alternative pain medications, received advice on treating hypertension, and been offered a third opinion on the de novo cartilage implantation surgery, none of which would show that plaintiff was not receiving proper treatment for his left ankle injury.  (ECF No. 79 at 8-9.)  Moreover, there was nothing showing that

plaintiff's left ankle injury was further deteriorating or required an urgent surgery.  (Id. at 9.)
Thus, Dr. Lee is also entitled to summary judgment.

### iii.  Dr. Lankford

In his verified complaint, plaintiff alleges that on March 2, 2015, Dr. Lankford told plaintiff that he would not schedule the second surgery for plaintiff because of plaintiff's high blood pressure.  (ECF No. 1 at 5.)  In response to defendant Dr. Lankford's admission that plaintiff's high blood pressure prevented Dr. Lankford from scheduling plaintiff's denovo cartilage implantation surgery (answer at 3; ECF No. 78 at 34), plaintiff cites to Dr. Lankford's May 8, 2015 interview during which Dr. Lankford reported he was going to schedule plaintiff for surgery, citing appeal log no. 15029094, first level response.  (ECF No. 78 at 5, 98 (on May 8, 2015, Dr. Lankford interviewed plaintiff, and the appeal response states plaintiff saw the orthopedic surgeon on May 14, 2015, received a Kenalog shot, and "will be scheduled for a left ankle arthroscopy.").)  In response to defendants' UDF's 43-44, plaintiff points out that Dr. Lankford did not provide his own declaration in support of the instant motion.  (ECF No. 77 at 4.)

First, the undersigned notes that the medical record for the March 2, 2015 visit reflects that Dr. Lankford charted by "subjective" that plaintiff "has left ankle surgery scheduled," and that Dr. Lankford "tried to explain . . . that the surgeon will probably not perform surgery if [plaintiff] is hypertensive."  (ECF No. 60-4 at 37.)  This record suggests that plaintiff told Dr. Lankford that the surgery was scheduled.  The parties point to no medical record confirming as a fact that it had been set.

Second, the medical record confirms that plaintiff was suffering from high blood pressure.  Plaintiff's blood pressure was recorded as 156/94, and he "does not want to get on meds" for his hypertension.  (Id.)  Moreover, the medical records confirm that plaintiff has a history of hypertension.[13]  (ECF No. 60-4 at 50, 53, 55, 57, & 64.)  Thus, taking as true plaintiff's statement that Dr. Lankford told plaintiff he would not schedule the surgery because plaintiff was hypertensive, such statement does not evince deliberate indifference.  Rather, as argued by

---

[13]  Even when he was taking amlodipine, his blood pressure registered 158/102 (ECF No. 81 at 8), and when taking prazosin, registered at 149/95 (ECF No. 60-4 at 53).

defendants, Dr. Lankford was appropriately concerned about plaintiff's ongoing high blood pressure.  It is undisputed that hypertensive blood pressure levels present additional complications to surgery including elevated risk for excessive bleeding, unstable heart rate, heart attack, or stroke.  (Lopez Decl. ¶ 16.)  Plaintiff adduces no competent medical evidence to the contrary.

Third, to the extent plaintiff argues that other doctors would perform the surgery even if plaintiff is hypertensive, such argument does not demonstrate Dr. Lankford's deliberate indifference.  Rather, it demonstrates a mere difference of opinion between medical professionals.

Fourth, in the third level appeal decision, it was noted that on March 4, 2015, a request for follow up with an orthopedist was completed, and by April 7, 2015, the referral for surgery had been completed and approved, and was pending scheduling.  (ECF No. 78 at 47.)  Therefore, even if Dr. Lankford said he would not schedule the surgery, it appears that plaintiff was referred to an orthopedist only two days later.

Finally, review of the statements plaintiff attributes to Dr. Lankford in Dr. Lee's first level response in appeal no. 15029094 does not change this court's analysis.  It is unclear what statements in the appeal were actually made by Dr. Lankford.  Moreover, the appeal reflects that plaintiff was seen by the orthopedic surgeon on May 14, 2015, and received a Kenalog shot, and would be scheduled for a left ankle arthroscopy.  (ECF No. 78 at 98.)  But it is not clear that Dr. Lankford referred plaintiff to the orthopedic surgeon, or that Dr. Lankford was involved in the scheduling of such surgery.  Plaintiff submitted no medical records confirming that Dr. Lankford referred plaintiff to the surgeon, or that Dr. Lankford scheduled the surgery.  Indeed, in his deposition, plaintiff testified that he did not know who ordered the second surgery.  (Pl.'s Dep. at 86.)  In addition, plaintiff adduces no additional evidence connecting Dr. Lankford to the subsequent delay in scheduling plaintiff's surgery from May to September 2015.

For all of these reasons, Dr. Lankford is entitled to summary judgment on plaintiff's claim that he refused to schedule plaintiff's second surgery due to plaintiff's high blood pressure.

X.  Qualified Immunity

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the

challenged conduct." Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) quoting Reichle v. Howards, 566 U.S. 658, 664 (2012). Qualified immunity analysis requires two prongs of inquiry: "(1) whether 'the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established' as of the date of the involved events 'in light of the specific context of the case.'" Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) quoting Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009). These prongs need not be addressed in any particular order. Pearson v. Callahan, 555 U.S. 223 (2009).

If a court decides that plaintiff's allegations do not make out a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001).

Here, the court finds that plaintiff has not established a violation of his Eighth Amendment rights. Accordingly, there is no need for further inquiry concerning qualified immunity.

XI. Conclusion

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Defendants' motion to strike (ECF No. 83) is denied; and

2. Plaintiff's response (ECF No. 81), construed as a sur-reply, is authorized and considered in connection with the motion for summary judgment; and

IT IS RECOMMENDED that defendants' motion for summary judgment (ECF No. 60) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be served and filed within fourteen days after service of the objections. The

////

////

parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 8, 2018

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

woma0533.msj.med